UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GLOBAL PAYROLL INVESTORS LLC f/k/a
EXPATICORE SERVICES LLC &DAVID
LEBOFF,                                                                         Docket No.:

                        Plaintiffs,                **COMPLAINT**

      -against-

                                                   **JURY TRIAL DEMANDED**

IMMEDIS, INC.,

                        Defendants.

-----------------------------------------------------------------X

Plaintiffs, Global Payroll Investors LLC (f/k/a Expaticore Services LLC) ("GPI") and David Leboff, ("Leboff") (collectively "Plaintiffs"), by their attorneys, the Law Offices of Jason L. Abelove, P.C. alleges, upon personal knowledge as to himself and upon information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

1. This is a diversity action alleging breach of contract.

2. Plaintiffs are alleging that Defendant Immedis, Inc. ("Immedis") breached certain portions of a Purchase Agreement, Promissory Note and an Employment Agreement all dated May 1, 2017. As a result, Plaintiffs are collectively owed in excess of $1,576,000.00, plus interest, costs and contractually mandated attorneys' fees.

## THE PARTIES, JURISDICTION AND VENUE

3. Plaintiff GPI is and was a domestic limited liability corporation authorized to do business in the State of New York with a principle place of business in the State of New York, county of Nassau.

4. Plaintiff Leboff is a natural person who has resided at all times hereinafter relevant in Rockville Centre, New York, within the State of New York, County of Nassau.

5. Upon information and belief, Immedis is a foreign corporation, incorporated in Delaware and authorized to do business in the state of New York, having its principal place of business at 485F Route 1, South Suite 220, Iselin, NJ 08830.

6. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to the complete diversity of citizenship, 28 U.S.C. 1332.

7. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

8. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District and the parties stipulated to venue in the Eastern District of New York.

## INTRODUCTION

9. At all times herein relevant, Plaintiff Leboff the majority owner and Managing Member of GPI. In total, there are four Members of GPI.

10. GPI was in the business or providing domestic and international payroll services, payroll tax, funds management, and international human resources consulting services.

11. On May 1, 2017 GPI entered into a transaction wherein it sold substantially all the assets of GPI to Immedis pursuant to an Asset Purchase Agreement with related documents such as a Promissory Note.

12. Contemporaneous with the GPI-Immedis transaction, Immedis entered into a three year Employment Agreement with Leboff dated May 1, 2017.

13. Both the GPI-Immedis Purchase Agreement and the Leboff-Immedis Employment agreement contained provisions containing additional post closing compensation that was tied to Immedis' Net Revenue.

14. Immedis intentionally undertook actions to artificially lower the Net Revenue calculations and refused to provide all necessary information for Plaintiffs to exactly calculate the Net Revenue. This caused Immedis to substantially underpay Plaintiffs.

15. This suit seeks damages for these under payments.

### GPI-IMMEDIS AGREEMENTS

16. On May 1, 2017, Immedis and GPI entered into a Purchase Agreement and related agreements whereby GPI sold to Immedis, through Immedis' purchase of substantially all of GPI's assets and the assumption of certain of GPI's liabilities.

*TERMS OF THE PURCHASE AGREEMENT*

17. Per the Purchase Agreement, Plaintiff was to receive as follows:

    a. $200,000.00 at closing (subject to adjustment for a portion of GPI's liabilities pursuant to an estimated balance sheet at time of closing);

    b. An additional $300,000.00 fixed payment ("Fixed Payment") eighteen (18) months from closing (subject to adjustment for a portion of GPI's liabilities per the final GPI closing balance sheet); and

    c. two annual "earn out" ("Earn Out") amounts payable to GPI, which were tied to the post-closing "Net Revenue" (as defined in the Purchase Agreement) of GPI.

18. With respect to the Earn Out, under the Purchase Agreement, if Net Revenue was between $1,750,000 and $2,250,000, the "First Year Earn Out Amount" was to be calculated as follows:

    (i) $1,000,000 minus (ii) 2 multiplied by the difference of $2,250,000 minus the actual Net Revenue in the First Year [i.e., from May 1, 2017, through April 30, 2018]. Purchase Agreement, § 2.9(b)(2).

19. Further, §2.9(g) of the Purchase Agreement defined "Net Revenue," as:

    *the gross revenue from the U.S. Clients accrued in accordance with the Accounting Principles . . . less the fees incurred in accordance with the Accounting Principles by Buyer to any subcontractor or independent contract engaged by Seller to provide any part of the services for which seller is engaged to provide to its clients.*

20. Accordingly, to properly define Net Revenue, Immedis was required to disclose and properly calculate its gross revenue, subcontractor fees, and currency related transaction fees.

*Payments made by Immedis*

21. Immedis made the required $200,000.00 payment at closing.

22. With respect to the Fixed Payment, the parties agreed that after the balance sheet adjustment, the amount due by Immedis was $267,533.96.

23. Despite this agreement, on November 1, 2018, Immedis paid only $195,458.10 toward this Fixed Payment, leaving a shortfall of $72,075.86.

24. Finally, with respect to the First Year Earn Out, on or about June 27, 2018, Immedis paid only $186,722.54 toward the First Year Earn Out, where the total amount due for the First Year Earn Out was $1,000,000.00. This represents a shortfall of $813,277.50.

*First Year Earn Out Dispute*

25. Despite due demand therefore, Defendant has refused to provide Plaintiffs with the books and records showing precisely how gross revenue, subcontractor or independent contractor fees, or fees for currency related transactions were calculated.

26. As stated above, on or about June 27, 2018, Immedis made a payment to GPI in the amount of $186,722.54, far below the $1,000,000.00 amount due GPI based on the incomplete financial disclosures it received from Immedis.

27. On June 29, 2018, GPI wrote Immedis to, among other things, protest that the payment was less than the amount owed under Section 2.9(b) of the Purchase Agreement.

28. For the First year, Immedis claimed Net Revenue to be $1,807,323.24, which, when using the Earn Out calculation above, equates to the $186,722.54 payment made by Immedis.

29. However, according to the limited financial disclosures provided, Net Revenue in the first year was actually in excess of $2,250,000.00 , which equates to a $1,000,000.00 payment that was due from Immedis.  This leaves an amount due GPI on the First Year Earn Out of $813,277.50.

30. Most of the difference centers around Immedis's tortured mistaken interpretation of the definition of "Net Revenue" pursuant to §2.9(g) of the Purchase Agreement, particularly the inappropriate method of calculating expenses such as subcontractor fees, currency related transaction fees and pushing expenses into subsequent years.

31. Because of the formula discussed above (as set forth in the Purchase Agreement), Immedis's exclusion of any amount from Net Revenue (by way of example only, $200,000) would result in a deduction of twice the amount (*e.g.,* $400,000) from the amount due GPI, and this math applies to all amounts excluded by Immedis from Net Revenue until the $1,000,000 cap on

the First Year Earn Out Amount is reached (*i.e.,* Net Revenue is over $2,250,000) pursuant to Section 2.9(b)(2).

32. The actions Immedis took to artificially lower the Net Revenue number are alleged below.

## **LEBOFF- IMMEDIS EMPLOYMENT AGREEMENT**

33. Section 4 of the Employment Agreement provided that Plaintiff be paid: (a) a certain salary for the three year term, (b) benefits, (c) an annual "Net Revenue Bonus", and (d) a "Long Term Incentive Bonus".

34. This Leboff-Immedis dispute focuses on Defendants improper cut to Plaintiff's salary, Annual Net Revenue Bonus and the Long Term Incentive Bonus.

35. Sections 4 (a) (c) and (d) of the Agreement provides,

    (a) <u>Salary.</u> For all services rendered by Employee under this Agreement, the Company shall pay Employee a salary (the "Salary") at the annual rate of (i) $270,000 for the first year of the Term; and (ii) $270,000 for each of the second and third years of the Term, provided that the Annual Net Revenue (defined below) is at least $2,250,000 in the preceding year of the Term. If the Annual Net Revenue is less than $2,250,000, then the Company shall have the discretion to lower the Salary for such years; provided, however, that any such salary reduction elected to be imposed by the Company in such circumstance shall not exceed fifteen percent (15%) of the salary payable to Employee hereunder immediately prior to such reduction.

    (c) <u>Annual Net Revenue Bonus</u>. On an annual basis, Employee shall receive an amount equal to 1.5% of Annual Net Revenue, provided that the Annual Net Revenue for the Term year then ended is at least $2,500,000.00. Such bonus shall be paid within 60 days of the end of the applicable Term year.

    (d) <u>Long Term Incentive Bonus</u>
(i) If the Term is three years, Employee is eligible for a bonus as set forth in this Section 4(d)(i). If the Annual Net Revenue for the second and third years of the Term, in the aggregate, is equal to or greater than $7,000,000, then the bonus shall equal 10% of the combined Annual Net Revenue for the second and third years of the Term. If the Annual Net Revenue, in the aggregate, for the second

and third years of the Term is equal to or greater than $2,500,000 but less than $7,000,000, then the bonus shall equal 5% of the combined Annual Net Revenue for the second and third years of the Term.

36. Section 4(e) of the Employment Agreement defined Annual Net Revenue as follows[1]:

   (i) For purposes of Sections 4(a) and 4(c), "Annual Net Revenue" is defined as (A) the gross revenue from the U.S. Clients collected by the Company on an annual basis during the Term, less the fees paid by the Company to any subcontractor or independent contractor engaged to provide any part of the services to U.S. Clients, all as determined under the Accounting Principles, plus (B) all gross revenue of the Company, or Immedis Unlimited Company, parent of the Company, or any subsidiary or affiliate of Immedis Unlimited Company, generated from currency transactions, U.S. dollar wires, and same currency wires performed on behalf of U.S. Clients ("Currency Transaction Revenue").

   (ii) For purposes of Section 4(d), "Annual Net Revenue" is defined as (A) the gross revenue from the U.S. Clients collected by the Company on an annual basis during the Term, less the fees paid by the Company to any subcontractor or independent contractor engaged to provide any part of the services to clients, all as determined under the Accounting Principles, plus (B) Currency Transaction Revenue, plus (C) projected annualized gross revenue for new U.S. Clients contracted during Employee's final three months of employment.

37. Following year one, contrary to the limited financial disclosures Defendant was providing, Defendant calculated Annual Net Revenue in such a way that Defendant reduced Plaintiff's salary in years two and three by $40,000.00 per year ($80,000.00 cumulatively).

38. With respect to the Annual Net Revenue Bonus, Plaintiff received a total of $44,491.60 in Annual Net Revenue Bonus, consisting of: (a) no payment for 2017/18; (b) a payment of approximately $44,491.60 for 2018/19; and (c) no payment for 2019/20.

39. With respect to the Long Term Incentive Bonus, Plaintiff received a total of $256,760.90.

---

[1] This is the same definition of Annual Net Revenue as the GPI-Immedis Purchase Agreement

40. These totals were far below the amount Plaintiff expected based upon the limited financial disclosures received from Defendant.

41. Like the Purchase Agreement, the primary reason around the discrepancy in Leboff's payment under the Employment Agreement centers around Immedis's mistaken interpretation of the definition of "Net Revenue".

42. Because of the formulas set forth in the Employment Agreement, Defendant's exclusion from any amount from Net Revenue would permit Defendant to: (a) reduce Plaintiff's salary; (b) lower by 1.5% or eliminate any Annual Net Revenue Bonus; and (c) lower Plaintiff's Long Term Incentive Bonus by 5%-10%.

43. Despite due demand therefore, Defendant has refused to provide Plaintiff with the books and records showing how gross revenue, subcontractor or independent contractor fees, or fees for currency related transactions were calculated. Accordingly, Plaintiff is unaware of the true "Net Revenue" numbers to allege affirmatively exactly what he is owed.

*Defendant's Improper Subcontractor Deductions*

44. Based upon the limited data provided by Defendant, approximately $1,572,000.00 of Immedis' parent corporation salaries were charged as subcontractor fees against the Net Revenue calculation over the three year term. This caused a substantial reduction in Immedis' payments to GPI and Leboff.

45. The key to GPI's First and Second Year Earn Out and Leboff's salary, Annual Net Revenue Bonus and Long Term Incentive Bonus is the calculation of Net Revenue as identically defined in the GPI-Immedis Purchase Agreement and the Leboff Employment Agreement.

46. Per these Agreements, in calculating the Net Revenue, the only permissible offsets are "fees incurred" by Defendant to any subcontractor or independent contractor "to provide any part of the services to client" as determined under Accounting Principles.

47. According to the limited documents Defendant has provided, at least $1,572,000.00 of: (a) salaries of Defendant's corporate officers, (b) the corporate officers of Defendants parent company, and (c) other employee overhead costs have been included in Defendant's definition of subcontractor fees over the three year employment term.

48. These sums represented corporate overhead costs, not fees for "subcontractors or independent contractors," and certainly not fees for subcontractors or independent contractors *engaged by GPI*.

49. In fact, the limited documents provided by Defendant illustrate that 95% of year one subcontractor fees were attributable to two executives and six senior manager employees of Defendant's parent company, Immedis Limited Company ("ILC").

50. Moreover, the work provided by these ILC executives were the type of general overhead and management that managers of an LLC provide. They were not the type of subcontracted payroll services intended under the Agreement.

51. In fact, during the time that GPI owned the assets and during the initial portion of the Agreement, all of these expenses were classified as overhead. They were only reclassified as subcontractor fees, when it was time to calculate bonuses owed pursuant to the Agreement and underlying Asset Purchase Agreement between Defendant and GPI.

52. There is no credible argument that ILC (Defendant's parent corporation) was a subcontractor of Immedis in providing payroll services to the clients (other than for specific payroll services separately contracted for and separately billed to Immedis).

53. By this intentional miscalculation of administrative overhead into subcontractor fees, Immedis improperly reduced Net Revenue a minimum of $214,623.16, thereby; (a) improperly withholding $429,246.32 from GPI's First Year Earn Out Amount (*See* Purchase Agreement, § 2.9(b)(2)); and (b) contributed to withholding $80,000.00 in salary to Leboff, and underpaying Leboff's Annual Net Revenue Bonus and the Long Term Incentive Bonus in an amount according to proof.

<i>Defendants Improper Allocation of Income and Expenses</i>

54. Prior to Defendant's purchase of the GPI assets, the accounting method used was an accrual method, where revenue and corresponding expenses were booked in the year the revenue was earned and expenses spent.

55. Before entering into the Asset Purchase Agreement and the Agreement at issue, Defendant extensively reviewed GPI's books and records as part of its due diligence, which included all information regarding Plaintiff's accounting methods and income allocations.

56. There was no provision in the Agreement to alter the method of allocating income and expenses.

57. At the end of the calendar year, eight months into the First Year contract term, Defendant changed the methodology for booking income and expenses.

58. Under the new methodology, rather than reporting income when earned, Defendant spread income over the term of the contract with the clients, regardless of when the money was earned.

59. Corresponding expenses were taken immediately.

60. As a result, much of the income earned was pushed out past the date that the term expired while the expenses against the revenue were taken immediately.

61. This accounting method artificially reduced the net income calculations and substantially lowered Plaintiffs salary, Annual Net Revenue Bonus, and Long Term Incentive Bonus.

62. Because Defendant has not provided a full accounting of income and expenses, the precise amount of Plaintiffs damages cannot be calculated. However, upon information and belief, the deferral of income while taking full expenses caused a reduction in Immedis' First Year Earn Out to be reduced by over $120,000.00 and contributed to Leboff's total compensation to be reduced in excess of $576,000.00.

*Defendant's Change in Billing Practices/Alterations to Costs of Goods Sold*

63. During the first year of the term, Defendant unilaterally altered the contracts of some clients to provide clients with 7-25% reductions in monthly billing. These reductions created a substantial change in Net Revenue for the first term of the Agreement by shifting income into the second term.

64. Because Defendants have not provided a full accounting of income and expenses, the precise amount of Plaintiffs damages cannot be calculated. However, upon information and belief, Defendant's conduct caused GPI's First Year Earn Out to be reduced by no less than $121,088.00. *See* Purchase Agreement, § 2.9(b)(2), and Leboff's total compensation to be reduced in excess of $576,000.00.

65. At the time the Agreement was negotiated, Defendant did not disclose that it was going to change this and other financial practices that had long term benefits to Defendants (including lowering amounts to GPI and Plaintiff) at the expense of money due under the Agreement.

66. There is no apparent reason for Immedis to reduce these fees, other than to improve its business prospects after the First Year. Immedis withheld from GPI the material fact of its

intention to do so until after the closing of the sale to Immedis and the Net Revenue targets for the earn outs in the Purchase Agreement (*see* § 2.9) were negotiated based on the existing billing practices.

### Rebate Regarding Cambridge

67. Immedis sought to deduct from Net Revenue credits given to a client based on errors made by Cambridge Mercantile Corp. (U.S.A.) ("Cambridge"), a foreign exchange provider for Immedis, without including as part of Net Revenue the rebate Immedis received from Cambridge because of such errors.

68. In other words, Immedis is taking the position that a $32,500.00 rebate received from Cambridge that was paid to it because Immedis gave credits to the impacted client does not constitute revenue for the purposes of the Net Revenue calculation.

69. Immedis improperly withheld the amount of the Cambridge rebate (*i.e.,* revenue) from Net Revenue or should have excluded the credits (*i.e.,* costs) in the Net Revenue calculation – it cannot have it both ways.

### **Fees and Costs**

70. Under the Purchase Agreement and the Note, Immedis is obligated to GPI for all legal fees and expenses incurred by GPI with respect to GPI obtaining all payments due under the Purchase Agreement and the Note, including all attorneys fees and costs incurred in this litigation. *See* Purchase Agreement, § 6.4; Note, § 5.

## FIRST CAUSE OF ACTION

## (BREACH OF CONTRACT)

71. Plaintiffs repeats and realleges paragraphs "1" through "70" as if set forth in full herein.

72. Defendant has breached, and continues to breach, its valid and existing Agreements with both GPI and Leboff and Plaintiffs have been, and continue to be, harmed thereby.

73. By virtue of the foregoing, Defendant is liable to GPI in the sum exceeding $885,353.12 plus interest, costs and attorneys' fees, and liable to Leboff in an amount to be determined by the Court, together with costs and interest, as allowable by law, in the minimum amount of $576,000.00.

## SECOND CAUSE OF ACTION

## (UNJUST ENRICHMENT)

74. Plaintiff repeats and realleges paragraphs "1" through "73" as if set forth in full herein.

75. By virtue of the foregoing, Defendant has shifted income, altered expenses and shifted its customer relationships in such a way as to make it look as if its Net Revenue is lower than it actually is.

76. Prior to and immediately after the Agreement, there was a uniform method for client relationships, allocation of expenses and calculation of expenses.

77. Defendant changed these allocations without notice to avoid paying certain amounts due under the Agreement.

78. Defendant has benefitted from its conduct. Under principals of equity and good conscience, Defendant should not be allowed to retain the benefit of its unlawful activities.

79. As a result, Defendant is liable to Plaintiffs in an amount to be determined by the Court, together with attorneys' fees costs and interest, as allowable by law.

## THIRD CAUSE OF ACTION

### (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

80. Plaintiff repeats and realleges paragraphs "1" through "79" as if set forth in full herein.

81. Prior to the transactions at issue, GPI had a methodology in allocating income and expenses and allocating subcontractor fees for many years.

82. Prior to entering into the Agreement, Defendant did substantial due diligence and had lengthy discussions regarding these practices and methods.

83. Both the GPI/Immedis Asset Purchase Agreement and the Leboff Employment Agreement were based upon calculations of Net Profit that Plaintiff and GPI had utilized for years, and Defendant utilized at the outset of the Agreement.

84. Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included. This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.

85. Defendants conduct as described above violated the Covenant of Good Faith and Fair Dealing, causing damages to Plaintiffs in an amount to be proven at trial, plus interest, costs and attorneys' fees.

## DEMAND FOR A JURY TRIAL

81. Plaintiff demands a trial by jury of all issues and claims in this action

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the court issue an order granting Plaintiff judgment on each and every cause of action and requiring Defendant to compensate Plaintiff for any and all of its damages pursuant to the above causes of action in an amount to be proven at trial, plus contractually mandated attorneys' fees, interest and costs of this action, plus such other and further relief as may be just and proper.

Dated: Garden City, New York
September 23, 2020

**LAW OFFICES OF JASON L. ABELOVE, PC**
Attorneys for Plaintiffs

By: _____/s/_____
Jason L. Abelove, Esq. (JLA-5327)
666 Old Country Road, Suite 303
Garden City, New York 11530
(516) 222-7000